1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RONNIE E. BARRON,                          No.  2:10-cv-1567 WBS DAD P

12                  Plaintiff,

13        v.                                     FINDINGS AND RECOMMENDATIONS

14   M. MARTEL et al.,

15                  Defendants.

16

17        Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking relief under

18   42 U.S.C. § 1983.  This matter is before the court on a motion for summary judgment brought

19   pursuant to Rule 56 of the Federal Rules of Civil Procedure on behalf of defendants Martinez and

20   Todd.  Plaintiff has filed an opposition to the motion, and defendants have filed a reply.  For the

21   reasons discussed below, the court will recommend that defendants' motion for summary

22   judgment be denied.

23                                    **BACKGROUND**

24        Plaintiff is proceeding on a second amended complaint in this civil rights action.  Therein,

25   he alleges that defendants Nurse Martinez and Physician's Assistant Todd failed to provide him

26   adequate medical care in connection with a rash and a bump on his chest that ultimately were

27   determined to turned out to be complications resulting from Valley Fever.  Plaintiff claims that

28   /////

                                             1

1  the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth

2  Amendment.  (Sec. Am. Compl. at 3 & Attach. 1-10.)

3  **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

4  Summary judgment is appropriate when the moving party "shows that there is no genuine

5  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

6  Civ. P. 56(a).

7  Under summary judgment practice, the moving party "initially bears the burden of

8  proving the absence of a genuine issue of material fact."  In re Oracle Corp. Securities Litigation,

9  627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

10  The moving party may accomplish this by "citing to particular parts of materials in the record,

11  including depositions, documents, electronically store information, affidavits or declarations,

12  stipulations (including those made for purposes of the motion only), admission, interrogatory

13  answers, or other materials" or by showing that such materials "do not establish the absence or

14  presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

15  support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden

16  of proof at trial, "the moving party need only prove that there is an absence of evidence to support

17  the nonmoving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.).

18  See also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after

19  adequate time for discovery and upon motion, against a party who fails to make a showing

20  sufficient to establish the existence of an element essential to that party's case, and on which that

21  party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  "[A] complete failure

22  of proof concerning an essential element of the nonmoving party's case necessarily renders all

23  other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so

24  long as whatever is before the district court demonstrates that the standard for entry of summary

25  judgment, . . ., is satisfied."  Id. at 323.

26  If the moving party meets its initial responsibility, the burden then shifts to the opposing

27  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

28  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

2

existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party."  Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

/////

/////

/////

3

**OTHER APPLICABLE LEGAL STANDARDS**

I. <u>Civil Rights Act Pursuant to 42 U.S.C. § 1983</u>

> The Civil Rights Act under which this action was filed provides as follows:
>> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  <u>See</u> <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658 (1978); <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of <u>respondeat superior</u> and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged.  <u>See</u> <u>Fayle v. Stapley</u>, 607 F.2d 858, 862 (9th Cir. 1979); <u>Mosher v. Saalfeld</u>, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient.  <u>See</u> <u>Ivey v. Board of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982).

II. <u>The Eighth Amendment and Inadequate Medical Care</u>

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986); <u>Ingraham v. Wright</u>, 430 U.S. 651, 670 (1977); <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976).  In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 298-99 (1991).

4

If a prisoner's Eighth Amendment claim arises in the medical care context, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106.  An Eighth Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference.  See Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835.
/////

1    Delays in providing medical care may manifest deliberate indifference.  Estelle, 429 U.S.

2    at 104-05.  To establish a claim of deliberate indifference arising from delay in providing care, a

3    plaintiff must show that the delay was harmful.  See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th

4    Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059;

5    Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198,

6    200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.

7    1985).  In this regard, "[a] prisoner need not show his harm was substantial; however, such would

8    provide additional support for the inmate's claim that the defendant was deliberately indifferent to

9    his needs."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

10   Finally, mere differences of opinion between a prisoner and prison medical staff or

11   between medical professionals as to the proper course of treatment for a medical condition do not

12   give rise to a § 1983 claim.  See Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012); Toguchi,

13   391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891

14   F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

15                                          **ANALYSIS**

16   Defendants Martinez and Todd have moved for summary judgment in their favor with

17   respect to plaintiff's claims against them on the grounds that:  (1) plaintiff's claims arising out of

18   alleged acts or omissions that took place before June 18, 2006, are barred by the applicable statute

19   of limitations; and (2) defendants were not deliberately indifferent to plaintiff's serious medical

20   needs.  Below, the court will address each of defendants' arguments in turn.

21   I.  Statute of Limitations for 42 U.S.C. § 1983

22   At the outset of defendants' motion for summary judgment, defense counsel briefly argues

23   that plaintiff's claims arising out of alleged acts or omissions that took place prior to June 18,

24   2006, are barred by the statute of limitations.  Specifically, counsel contends that plaintiff mailed

25   his complaint to this court for filing on June 18, 2010, and therefore the statute of limitations bars

26   any claims that plaintiff alleges took place before June 18, 2006.  In defense counsel's view,

27   inmate appeals filed on December 7, 2005, and June 8, 2006 by plaintiff,  show that he was aware

28   of his claims before June 18, 2006.  (Defs.' SUDF 47-48, Defs.' Mem. of P. & A. at 6-7.)

1     As an initial matter the court will address the applicable statute of limitations.  Because §

2     1983 does not contain a specific statute of limitations, federal courts apply the forum state's

3     statute of limitations for personal injury actions.  See Jones v. Blanas, 393 F.3d 918, 927 (9th Cir.

4     2004); Maldonado v. Harris, 370 F.3d 945, 954 (9th Cir. 2004); Fink v. Shedler, 192 F.3d 911,

5     914 (9th Cir. 1999).  California's statute of limitations for personal injury actions is two years.

6     Jones, 393 F.3d at 927.  Federal courts also apply the forum state's laws with respect to tolling of

7     the statute of limitations insofar as state law is not inconsistent with federal law.  See id.  Under

8     California law, the statute of limitations is tolled for up to two years where the cause of action

9     accrues while the plaintiff is in prison.  See Cal. Civ. P. Code § 352.1.

10    Unlike the length of the statute of limitations or the question of tolling, federal courts

11    apply federal law to determine when a § 1983 cause of action accrues.  Under federal law, a §

12    1983 cause of action accrues, and the statute of limitations begins to run, when the defendants'

13    alleged wrongful act or omission causes damage(s).  See Wallace v. Kato, 549 U.S. 384, 388

14    (2007).  Thus, "a claim accrues when the plaintiff knows or has reason to know of the injury

15    which is the basis of the action."  Maldonado, 370 F.3d at 955.

16    In this case, the court finds that plaintiff's cause of action accrued no earlier than January

17    2007, when the parties acknowledge that plaintiff first received the diagnosis that he was

18    suffering from Valley Fever.  (Pl.'s Dep. at 71 & Defs.' SUDF 40-41.)  To be sure, plaintiff

19    sought medical treatment from defendants well before he received his Valley Fever diagnosis.

20    However, plaintiff's claims and injuries are based on defendants' alleged failure to properly

21    diagnose and adequately treat his Valley Fever.  Plaintiff could not have known that defendants

22    did not properly diagnose and treat him and could not have known about the nature of his injuries

23    stemming therefrom until he received his Valley Fever diagnosis.  See Reece v. Basi, No. 2:11-

24    cv-2712 GEB AC, 2013 WL 1339048 at *6 (E.D. Cal. Apr. 3, 2013) ("The onset of symptoms

25    does not necessarily mark the accrual of the cause of action . . . . ").  Cf. Kimes v. Shinseki, No.

26    CIV S-09-0853 KJM DAD PS, 2011 WL 864481 at *8 (E.D. Cal. Mar. 10, 2011) (in medical

27    malpractice case plaintiff's claims did not accrue for purposes of FTCA statute of limitations until

28    he was properly diagnosed and had knowledge of his injury).

As such, in this case plaintiff had until January 2011 (the two-year limitations period plus the two-year statutory tolling due to plaintiff's incarceration) to file his § 1983 action in this court.  As defense counsel acknowledges, plaintiff mailed his original complaint to the court for filing on June 18, 2010.  Accordingly, plaintiff's complaint is timely, and defendants' motion for summary judgment based on the statute of limitations should be denied.[1]

---

[1] The undersigned observes that the continuing violation doctrine would also appear to bring this case well within the statute of limitations.  As one Magistrate Judge of this court recently explained in another prisoner civil rights case in which the plaintiff claimed deliberate indifference to his serious medical needs:

> The continuing violation doctrine is an equitable doctrine designed "to prevent a defendant from using its earlier illegal conduct to avoid liability for later illegal conduct of the same sort."  O'Loghlin v. County of Orange, 229 F.3d 871, 875 (9th Cir. 2000).  To establish a continuing violation, a plaintiff must show "a series of related acts against a single individual . . . that . . . 'are related closely enough to constitute a continuing violation.'"  Green v. Los Angeles County Superintendent of Schools, 883 F.2d 1472, 1480–81 (9th Cir.1989) (quoting Bruno v. Western Elec. Co., 829 F.2d 957, 961 (10th Cir. 1987)).  However, the mere continuing impact from a past violation is not actionable under the continuing violation doctrine.  Knox v. Davis, 260 F.3d 1009, 1013 (9th Cir. 2001) (citing Grimes v. City and County of San Francisco, 951 F.2d 236, 238–39 (9th Cir. 1991)).

> Although the Ninth Circuit has not applied the continuing violation doctrine to Eighth Amendment deliberate indifference claims, several other circuits have.  See Heard v. Sheahan, 253 F.3d 316, 318 (7th Cir. 2001) (finding that continuous violation doctrine applied to defendants' deliberate indifference for the span of time that prison officials were aware of plaintiff's injury and allegedly refused to treat it); Lavellee v. Listi, 611 F.2d 1129, 1132 (5th Cir. 1980) ("[T]he [arrestee's] allegation of a failure to provide needed and requested medical attention constitutes a continuing tort, which does not accrue until the date medical attention is provided."); Neel v. Rehberg, 577 F.2d 262, 263–64 (5th Cir. 1978) (per curiam) (finding that where inmate alleged that jail officials failed to provide medical treatment over a three-month period, the continuous violation doctrine applied and the statute of limitations did not begin to run until the end of that period); see also Evans v. County of San Diego, No. 06 CV 0877 JM (RBB), 2008 WL 842459, at *12 (S.D. Cal. Mar. 27, 2008) (applying continuing violation doctrine to prisoner's Eighth Amendment medical treatment claim).

Martin v. Woodford, No. 1:08-cv-0415 LJO SKO PC, 2010 WL 2773235 at *4-*5 (E.D.Cal. July 13, 2010), adopted by 2010 WL 3853305 (E.D. Cal. Sept. 29, 2010), aff'd, Case No. 11015830, 2013 WL 29792 (9th Cir. Jan. 3, 2013).

1    II. Deliberate Indifference to Plaintiff's Serious Medical Needs

2          A. Defendants' Evidence and Arguments

3          The undersigned now turns to defense counsel's argument that defendants Martinez and

4    Todd are entitled to summary judgment in their favor on the merits of plaintiff's claims.  Defense

5    counsel argues that the evidence submitted on summary judgment establishes that the defendants

6    were not deliberately indifferent to plaintiff's serious medical needs and that they provided

7    plaintiff with medically acceptable care and treatment.  (Defs.' Mem. of P. & A. at 7-12.)

8    Defense counsel has submitted a statement of undisputed facts supported by declarations signed

9    under penalty of perjury by defendants Martinez and Todd and Dr. Barnett, the Chief Medical

10   Officer for the California Prison Health Care Services, Receiver's Office of Legal Affairs.  That

11   statement of undisputed facts is also supported by citations to plaintiff's second amended

12   complaint and to plaintiff's medical records.  The evidence submitted by the defendants in

13   support of their motion for summary judgment establishes the following.

14         At all relevant times to this suit, plaintiff was an inmate at Mule Creek State Prison

15   ("MCSP").  Plaintiff arrived at MCSP in August 2004.  For many years before arriving at MCSP,

16   dating back to before his incarceration in 1989, plaintiff suffered from a chronic fungal skin

17   infection and rash that waxed and waned with antifungal treatment.  Plaintiff also arrived at

18   MCSP with a chronic hepatitis C infection.  (Defs.' SUDF 1-3, Sec. Am. Compl., Barnett Decl.,

19   Pl's Dep.)

20         Defendant Martinez is a registered nurse and defendant Todd is a physician's assistant,

21   both of whom were employed at MCSP at all relevant times.  When defendants Martinez and

22   Todd first encountered plaintiff after his arrival at MCSP in August 2004, they were aware from

23   his medical records that he had a history of chronic skin rash and chronic hepatitis C.  Plaintiff's

24   clinical condition at that time was essentially unchanged from the decade before, during which

25   time multiple physicians treated him with both topical and oral medications, including the oral

26   medication fluconazole.  (Defs.' SUDF 4-6, Todd Decl., Martinez Decl., Barnett Decl., Pl's Dep.)

27         Coccidioidomycosis, also known as Valley Fever, is a fungal infection caused by the

28   organism Coccidioides Immitis.  Persons exposed to C. Immitis can have a range of reactions

from not getting sick at all to getting flu-like symptoms or pneumonia.  In more serious cases, disseminated coccidioidomycosis can lead to infection of the skin, bone, heart, joints, and brain. On May 11, 2004, a blood test done found no evidence of acute coccidioidomycosis infection, and plaintiff did not report or display any signs or symptoms of coccidioidomycosis when he later arrived at MCSP in August 2004.  (Defs.' SUDF 7-8, Barnett Decl.)

Chronic hepatitis C often causes progressive liver damage, manifested in part by abnormal liver function tests.  Oral treatments for fungus infections can cause elevated liver function test results, accordingly oral antifungal treatments should be administered very cautiously, if at all, in patients who suffer from chronic hepatitis C.  The use of fluconazole in a patient with underlying liver disease is disfavored and potentially dangerous.  (Defs.' SUDF 9, Barnett Decl.)

On August 19, 2004, with the approval of the supervising physician at MCSP, defendant Todd continued plaintiff's topical antifungal treatment (miconazole) and discontinued his fluconazole.  The decision to continue with topical miconazole and to discontinue oral fluconazole was medically reasonable and consistent with the best medical practices.  Plaintiff's chronic fungal dermatitis was not life-threatening and had responded to topical treatments in the past.  (Defs.' SUDF 10-12, Todd Decl., Barnett Decl.)

At various times after August 2004, plaintiff reported that his rash had gotten worse and had spread.  On July 19, 2005, plaintiff saw defendant Martinez, reported his continued rash, and asked to see a skin specialist.  Defendant Martinez examined plaintiff's condition and relayed his concerns to the supervising physician Dr. Milliman.  Dr. Milliman ordered continued treatment with miconazole cream.  Plaintiff requested refills of miconazole, which defendant Martinez ordered on August 3, 2005, August 25, 2005, and September 1, 2005.  Plaintiff asked for another refill on October 13, 2005, and defendant Martinez referred him to see a doctor.  (Defs.' SUDF 13-15, Martinez Decl., Barnett Decl.)

On January 25, 2006, plaintiff saw Dr. Hashimoto, who prescribed a six-week application of the topical antifungal medication clotrimazole.  On July 21, 2006, plaintiff saw defendant Martinez.  She assessed his condition, provided him with a tube of topical antifungal medication tolnaftate, and advised him to submit another health care request if his symptoms persisted.  On

July 25, 2006, plaintiff submitted a health care request, and on July 26, 2006, defendant Martinez assessed his condition and provided him with another tube of tolnaftate.  (Defs.' SUDF 16-18, Barnett Decl.)

On August 28, 2006, plaintiff saw defendant Martinez and reported his rash had gotten worse.  Defendant Martinez consulted with Dr. Hashimoto and at his direction referred plaintiff to see a physician for further evaluation.  Defendant Martinez is a registered nurse and had no duty to make a new diagnosis or institute any new treatments.  Defendant Martinez was not responsible for prescribing medications or filling prescriptions but forwarded prescriptions or requests for refills to the pharmacy, which then determined whether a medication was due for a refill by reviewing the relevant physician's order.  Prescription medications were dispensed only if they had been prescribed.  (Defs.' SUDF 19-21, Martinez Decl., Barnett Decl.)

On every occasion that defendant Martinez had a medical visit with plaintiff, she asked about his current complaints, assessed his condition, and determined whether to consult with or refer plaintiff to a physician or provide other care within the scope of her professional training.  (Defs.' SUDF 22, Martinez Decl., Pl.'s Dep.)

On September 4, 2006, plaintiff submitted a health care request asking to see a dermatologist.  The next day, physician's assistant Bauer saw plaintiff, assessed his chronic rash, prescribed topical antifungal medication, and scheduled a doctor's appointment for him.  (Defs.' SUDF 23, Barnett Decl.)

Plaintiff initially told defendant Martinez that he had a "bump" on his chest from a strenuous workout or pulled muscle.  Plaintiff's recollection is that when the bump on his chest grew larger, defendant Martinez advised him that an appointment would be made and that he was seen by defendant Todd two weeks later.  On or about October 10, 2006, defendant Todd, under the supervision of Dr. Hawkins, saw plaintiff to follow up on his fungal infection and monitor his blood pressure.  Plaintiff expressed concern over his continued rash and reported a bump on his chest that had appeared three weeks earlier after working out.  Defendant Todd examined the soft-tissue mass, ordered a chest x-ray, and referred plaintiff to Doctors Hospital of Manteca
/////

1   ("DHM") for an MRI.  Plaintiff's x-ray was inconclusive.  (Defs.' SUDF 26-29, Todd Decl.,

2   Barnett Decl., Pl.'s Dep.)

3          On October 19, 2006, plaintiff followed up with a nurse who instructed plaintiff to look

4   for signs of infection, such as redness, drainage, or warmth.  On November 1, 2006, plaintiff had

5   an MRI at DHM and was scheduled for a follow-up visit at MCSP clinic within fourteen days.

6   On November 9, 2006, plaintiff saw Dr. Hawkins, reviewed the MRI report from DHM, which

7   indicated "an abscess with bony involvement or a necrotic tumor."  Defendant Todd referred

8   plaintiff for a surgical consult for excision of the mass, scheduled a follow-up visit in three

9   weeks, and provided a topical cream for plaintiff's itching, peeling skin.  (Defs.' SUDF 30-34,

10  Todd Decl., Barnett Decl.)

11         On December 6, 2006, plaintiff had a surgical consult with Dr. Weiner at DHM.  Plaintiff

12  again related the bump on his chest to heavy lifting.  Dr. Weiner found no signs of infection,

13  assessed the mass as a probable hematoma, and ordered scheduling for an incision and drainage

14  procedure under general anesthesia.  The following week, the mass on plaintiff's chest began to

15  drain on its own.  Plaintiff saw Dr. Galloway who dressed the wound at MCSP on December 26,

16  2006.  Dr. Weiner performed the incision and drainage procedure at DHM on January 4, 2007,

17  and ordered a pathology report.  (Defs.' SUDF 35-37, Barnett Decl.)

18         On every occasion that plaintiff had a medical visit with defendant Todd, she interviewed

19  plaintiff regarding his medical history, reviewed his pertinent medical records, conducted a

20  physical examination, assessed his condition, and participated in determining and prescribing an

21  appropriate treatment plan.  (Defs.' SUDF 39, Todd Decl., Barnett Decl., Pl.'s Dep.)

22         On January 31, 2007, Dr. Weiner reviewed the pathology report, which showed that the

23  abscess on plaintiff's chest was caused by disseminated coccidioidomycosis.  Plaintiff had not

24  been diagnosed with Valley Fever before this biopsy in January 2007.  Valley Fever is not treated

25  with topical antifungal medications.  The topical antifungal medications prescribed for plaintiff

26  were directed to the treatment of his chronic fungal skin infection.  The presence, timing, severity,

27  and duration of plaintiff's condition of Valley Fever could not have been and was not affected by

28  any treatment or lack of treatment with topical antifungal medications.  According to Dr. Barnett,

1    all of the care that defendant Martinez and defendant Todd provided to plaintiff was appropriate

2    and within the standard of care.  (Defs.' SUDF 40-46, Barnett Decl.)

3         B.  Plaintiff's Evidence and Arguments

4         The evidence submitted by plaintiff in support of his opposition to defendants' motion for

5    summary judgment establishes the following. [2]  Plaintiff transferred from Pleasant Valley State

6    Prison to MCSP in August 2004 and expressed concern to the medical staff about a rash he had

7    developed.  The staff recorded plaintiff's complaint in his medical file and told him they would

8    ducat him once he was in a housing unit.  Defendant Martinez ducated plaintiff to the facility

9    clinic and interviewed him.  Plaintiff showed the defendant his rash, which defendant Martinez

10   determined was a severe case of fungal infection and gave plaintiff a tube of antifungal cream.

11   Defendant Martinez told plaintiff to fill out a CDC 7362 for any necessary refills until plaintiff

12   could see a physician.  (Sec. Am. Compl. at 3, Pl.'s Decl. at 1.)

13        Plaintiff subsequently saw defendant Todd who also gave him the same antifungal cream

14   even though plaintiff expressed that the cream was not working.  Defendant Todd told plaintiff

15   that the antifungal cream would be his treatment for the next 60 days, and if he had a problem he

16   could fill out a 7362 form.  Plaintiff declares that he thereafter filled out numerous 7362 forms

17   because his rash spread to both buttocks and the left side of his waist.  It was not until plaintiff

18   filed an inmate appeal (or "CDC 602") on December 7, 2005, that he was scheduled to meet with

19   defendant Martinez again.  (Sec. Am. Compl. at 3 & Attach. at 1, Pl.'s Decl. at 1., Pl.'s Opp'n Ex.

20   C (inmate appeals).)

21        On December 28, 2005, defendant Martinez interviewed plaintiff in response to his CDC

22   602, but according to plaintiff, she ignored his requests and concerns, refused to examine his rash,

23   and instead continued to give him tubes of cream to treat the worsening rash.  On January 2,

24   2006, plaintiff filed another CDC 602 complaining about his medical care and asked to see a

25   physician.  On January 25, 2006, plaintiff saw Dr. Hashimoto and told him the antifungal cream

26   was not working, and that the rash was spreading rapidly across his body.  Dr. Hashimoto

27   ────────────────

[2]  The court has considered plaintiff's opposition to the pending motion for summary judgment as
28   supported by his sworn deposition testimony and his verified complaint.

1   nevertheless prescribed plaintiff the same antifungal cream that had proven ineffective and told

2   plaintiff that the fungus was below his skin and would need time to heal.  (Sec. Am. Compl.

3   Attach. at 1, Pl.'s Decl. at 1, Pl.'s Dep. at 88-91, 98, 119, Pl.'s Opp'n Ex. C (inmate appeals).)

4        After seeing Dr. Hashimoto, plaintiff filled out additional 7362 forms for refills of the

5   antifungal cream, which were ignored and delayed.  On June 8, 2006, plaintiff filed another CDC

6   602 complaining that he had filled out refill slips and wrote to defendant Martinez four different

7   times but received no responses from her.  In response to the CDC 602, defendant Martinez

8   interviewed plaintiff again.  Plaintiff told her that he had a bump on his chest that had begun to

9   grow.  Defendant Martinez asked plaintiff who hit him, and after plaintiff told her that nothing of

10  that nature had occurred, defendant Martinez diagnosed the bump as a pulled muscle even though

11  plaintiff explained that he had not done any strenuous exercise.  Defendant Martinez ignored

12  plaintiff and explained that the bump would get better.  Plaintiff also expressed "extreme

13  concern" about his spreading rash at that time.  Again, defendant Martinez merely gave him more

14  antifungal cream.  (Sec. Am. Compl. Attach. at 2, Pl.'s Decl. at 2, Pl.'s Opp'n Ex. C (inmate

15  appeals).)

16       After plaintiff's meeting with defendant Martinez, plaintiff began filling out additional

17  7362 forms for refills and/or to see a physician to no avail.  On August 18, 2006, plaintiff filed

18  yet another CDC 602, complaining that defendant Martinez never issued the necessary orders that

19  would allow him to refill his medication for a rash that was continually getting worse.  Plaintiff

20  also asked to see a dermatologist.  In response to plaintiff's inmate appeal, defendant Martinez

21  interviewed plaintiff once more, and during this meeting she called plaintiff dumb and stupid for

22  filing an inmate appeal and had plaintiff's cell searched for his medication.  Plaintiff reiterated his

23  concern about the bump in the middle of his chest because it was growing large and repeated his

24  complaint that his rash was spreading.  Defendant Martinez said that another appointment would

25  be made for plaintiff but that if he was not bleeding to death or falling out it was not an

26  emergency.  (Sec. Am. Compl. Attach. at 2-3, Pl.'s Decl. at 2, Pl.'s Dep. at 95-96, 119, Pl.'s

27  Opp'n Ex. C (inmate appeals).)

28  /////

On September 11, 2006, plaintiff saw defendant Todd again and raised the issues of his rash and the bump on his chest.  Defendant Todd ordered x-rays and an MRI of the bump on plaintiff's chest and gave him a lotion to apply to keep the skin around the bump from cracking.  Defendant Todd also gave plaintiff more antifungal cream for his ever-worsening rash.  On September 25, 2006, plaintiff returned to the facility clinic and was told that an order was being written up to refer plaintiff for a surgery consultation.  (Sec. Am. Compl. Attach. at 3, Pl.'s Decl. at 2-3.)

On December 18, 2006, a piece of the skin from the bump on plaintiff's chest ripped off while he was removing his shirt to shower.  The bump then began to drain, and M.T.A. Stanford gave plaintiff extra strength sulform thoxazale because the area was severely infected.  In the ensuing days, the wound continued to drain, so plaintiff returned to the infirmary.  Dr. Galloway prescribed plaintiff additional sulform thoxalzale and told him he could get gauze and tape to cover the area.  Dr. Galloway also determined that defendant Todd had never wrote an order for a surgical consultation for plaintiff, so Dr. Galloway issued one.  On December 25, 2006, and January 16, 2007, plaintiff filed inmate appeals complaining about the medical care provided by defendant Todd.  Finally, on January 4, 2007, plaintiff was taken to Manteca Hospital where Dr. Weiner examined plaintiff's chest wound and said it needed to be cleaned right away.  Plaintiff was then taken to surgery for incision and drainage procedures.  (Sec. Am. Compl. Attach. at 4-6, Pl.'s Decl. at 3-4, Pl.'s Dep. at 114, Pl.'s Opp'n Ex. C (inmate appeals).)

Not long after plaintiff returned to MCSP the wound on his chest got worse and started self-draining again.  On April 2, 2007, plaintiff filed another inmate appeal concerning the bump on his chest and asked not to see defendant Todd because of her prior delays in providing him treatment and denials of his medical care requests.  On July 2, 2007, plaintiff asked to go back to Manteca Hospital.  Due to plaintiff's prior procedure at that hospital, which left him with a reopened wound, Dr. Hawkins instead referred him to U.C. Davis Medical Center.  In the meantime, on July 21, 2007, August 7, 2007, plaintiff filed additional inmate appeals regarding defendant Martinez and Todd's alleged inadequate treatment of his ongoing medical conditions.  (Sec. Am. Compl. Attach. at 7-8, Pl.'s Decl. at 4, Pl.'s Opp'n Ex. C (inmate appeals).)

On November 7, 2007, plaintiff saw Dr. Melcher, an infectious disease specialist and professor at U.C. Davis Medical Center.  Dr. Melcher examined plaintiff's rash and chest wound and questioned why plaintiff had not received medical attention earlier.  Dr. Melcher ordered a blood test and C.T. scan for plaintiff, and on January 7, 2008, diagnosed plaintiff as suffering from Valley Fever.  Dr. Melcher prescribed plaintiff with posaconazole but believed he would not be able to control plaintiff's cocci infection with posaconazole alone.  (Sec. Am. Compl. Attach. at 8, Pl.'s Decl. at 5, Pl.'s Opp'n Ex. F (Dr. Melcher Progress Notes Feb. 28, 2008 & Aug. 8, 2008.)

On February 28, 2008, plaintiff was taken back to U.C. Davis Medical Center where he met with Dr. Melcher and Dr. Vera.  According to their medical notes, plaintiff had "disseminated coccidiomycosis with pulmonary soft tissue and sternal involvement."  Plaintiff's C.T. scan showed "completely destroyed sternum . . . replaced with infection."  The doctors admitted plaintiff to the hospital for surgical management of what turned out to be "extensive disseminated coccidiomycosis."  Plaintiff underwent incision and drainage procedures, including "debridement of the entire sternum and a right middle lobe wedge resection with radical sternectomy."  In other words, doctors removed plaintiff's sternum and part of his lung, which was infected by Valley Fever.  According to plaintiff, he had muscle, fat, skin, and his heart taken out of his chest to make sure the infection had not spread to other areas, and he "flat-lined" once during surgery and once during recovery.  (Sec. Am. Compl. Attach. at 8-9, Pl.'s Decl. at 5-6, Pl.'s Opp'n Ex. F (Dr. Melcher Progress Note Feb. 28, 2008 & Dr. Vera Progress Note Feb. 29, 2008.)

Plaintiff also received considerable postoperative care.  He was hospitalized from March 2008 to May 2008.  According to plaintiff, doctors kept his chest open for two weeks to fight off his infection, and he was in so much pain at one point that he bit down on his intubation tube and knocked out two of his teeth, which have since been replaced by a partial.  Plaintiff continues to suffer chronic pain, nerve damage, and shortness of breath, particularly while lying down.  He is no longer able to work out or walk fast without getting short of breath.  To protect the area of his chest where his sternum used to be, plaintiff uses a "homemade plate" – two straps and two shower shoes sewed together with a kitchen apron put together by his fellow inmates at MCSP.

1   Plaintiff used to weigh as much as 216 pounds, but since his surgery he now weighs only 135

2   pounds.  Plaintiff has also started seeing a psychiatrist to help his depression and anxiety over the

3   events described herein.  (Sec. Am. Compl. Attach. at 9, Pl.'s Decl. at 6, Pl.'s Opp'n Ex. F (Dr.

4   Melcher & Dr. Vera Progress Notes), Pl.'s Opp'n Ex. G (psychiatric progress notes), Pl.'s Dep. at

5   33-34, 52-53, 130-131, 137-138, 141-144.)

6           C.  Discussion

7           The undersigned begins by recognizing that even assuming for the sake of argument that

8   defendants Martinez and Todd have met their initial burden of demonstrating that there is no

9   genuine issue of material fact with respect to the adequacy of the medical care provided to

10  plaintiff, on defendants' motion for summary judgment the court is required to believe plaintiff's

11  evidence and draw all reasonable inferences from the evidence before the court in plaintiff's

12  favor.  Drawing all such reasonable inferences in plaintiff's favor, the court finds that plaintiff has

13  submitted sufficient evidence to create a genuine issue of material fact with respect to his claim

14  that defendants Martinez and Todd responded to his serious medical needs with deliberate

15  indifference in violation of the Eighth Amendment.  See Farmer, 511 U.S. at 834; Estelle, 429

16  U.S. at 106.

17          As an initial matter, it appears that the parties have a genuine dispute about plaintiff's

18  underlying medical condition(s).  On the one hand, defendants take the position that plaintiff

19  suffered from two distinct medical conditions during the time period relevant to this action.

20  Specifically, defendants contend that plaintiff had a chronic "fungal skin infection" or "jock itch"

21  or "jock rash."  In addition, defendants contend that plaintiff had a bump on his chest that was a

22  complication stemming from his Valley Fever.  (Defs.' Mem. of P. & A. at 8-12.)

23          On the other hand, plaintiff takes the position that the chronic "fungal skin infection" that

24  he sought treatment for as well as the bump on his chest were both caused by his untreated Valley

25  Fever infection.  At plaintiff's deposition, for example, he testified that the rash he suffered from

26  and sought treatment for from the defendants was different from "jock itch," and he actually told

27  defendant Martinez "[t]his is something different" and "this [cream] is not working."  (Pl.'s Dep.

28  at 56-57, 87-88.)  He further testified that the rash was all over his body, and it did not take the

17

1   same appearance as jock rash.  (Id. at 56.)  It "was a lot of purple, and it wasn't peeling like jock

2   rash."  (Id. at 56, 65-66.)  Plaintiff also testified that the rash did not start in the groin area and

3   instead started on his leg in the form of a pimple, then spread around and up his buttocks, across

4   and up his back, and onto his side.  (Id. at 56-57.)  Plaintiff explained during his deposition that

5   he knew the rash he suffered from was not just jock rash because jock rash would go away if he

6   used the cream.  (Id. at 61-62.)  Finally, plaintiff testified that at present, he no longer suffers

7   from the rash.  (Id. at 55.)

8           As noted above, on summary judgment, the court must draw all reasonable inferences

9   from the facts in plaintiff's favor.  Based on the evidence of record in this case, the court finds

10   that it is reasonable to infer that plaintiff's rash as well as the bump on his chest were both caused

11   by, or related to, his Valley Fever.  The court further finds (and the parties do not dispute) that a

12   reasonable juror could and in fact would conclude that plaintiff's Valley Fever constitutes an

13   objective, serious medical need.  See McGuckin, 974 F.2d at 1059-60 ("The existence of an

14   injury that a reasonable doctor or patient would find important and worthy of comment or

15   treatment; the presence of a medical condition that significantly affects an individual's daily

16   activities; or the existence of chronic and substantial pain are examples of indications that a

17   prisoner has a 'serious' need for medical treatment."); Canell v. Bradshaw, 840 F. Supp. 1382,

18   1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical

19   conditions that may result in pain and suffering which serve no legitimate penological purpose.").

20   Plaintiff's medical history and the observations and treatment recommendations by the defendants

21   as well as other prison doctors and outside specialists compel the conclusion that plaintiff's

22   medical condition(s), if left untreated, could result in "further significant injury" and the

23   "unnecessary and wanton infliction of pain."  McGuckin, 974 F.2d at 1059.

24           Turning now to defendants' treatment of plaintiff's serious medical needs, the evidence

25   submitted by the parties on summary judgment also reflects a genuine dispute about whether

26   defendants' ongoing treatment of plaintiff was reasonable and medically acceptable.  Defendants

27   maintain that their treatment of plaintiff's "jock itch" rash and the bump on his chest was

28   medically acceptable.  For example, at each visit with defendant Martinez, she asked plaintiff

about his complaints, assessed his condition, and determined whether it was appropriate to consult with or refer plaintiff to a physician or provide him other care within the scope of her training.  She also forwarded prescriptions and requests for refills to the pharmacy for plaintiff's antifungal cream for his rash and advised plaintiff that an appointment would be made in response to the worsening bump on his chest.  As a registered nurse, defendant Martinez had no duty to make a new diagnosis or institute any new treatments.  (Defs.' Mem. of P. & A. at 8-11.)

Similarly, each time defendant Todd saw plaintiff, she interviewed plaintiff, reviewed his medical records, conducted physical examinations, assessed his condition, and participated in determining and prescribing an appropriate treatment plan for him.  Defendant Todd also ordered a chest x-ray of the bump on plaintiff's chest and referred him to Doctors Hospital of Manteca for an MRI as well as a surgical consult for excision of the mass.  (Defs.' Mem. of P. & A. at 11-12.)

To be sure, the parties do not dispute that defendants Martinez and Todd provided plaintiff with some form of medical treatment.  The mere fact that defendants did so, however, does not necessarily absolve them of liability for their actions.  See Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  In Ortiz, the Ninth Circuit held that prisoner-plaintiffs (and their survivors) are not required to demonstrate that the defendants completely failed to treat them to survive summary judgment.  See id. at 1314; see also Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) ("A prisoner need not prove that he was completely denied medical care.") (en banc). In this regard, the Ninth Circuit made clear that "access to medical staff is meaningless unless that staff is competent and can render competent care."  Ortiz, 884 F.2d at 1314 (quoting Cabrales v. County of Los Angeles, 864 F. 2d 1454, 1461 (9th Cir. 1988).

This court has recently relied on the decision in Ortiz in holding that a prisoner-plaintiff established "a genuine dispute of material fact as to whether a defendant doctor and defendant nurse were deliberately indifferent – not because they entirely failed to treat him, but because they (possibly) knew and disregarded plaintiff's risk of having scabies when other treatments proved ineffective."  See Tenore v. Goodgame, No. 2:11-cv-1082 WBS CKD P, 2014 WL 496697 at *10 (E.D. Cal. Feb. 6, 2014), adopted by, 2014 WL 907286 (E.D. Cal. Mar. 7, 2014).
/////

In Tenore, a prisoner-plaintiff sued a prison nurse and doctor and alleged that they were deliberately indifferent in the diagnosis and treatment of plaintiff's scabies infection while he was housed at MCSP.  See Tenore, 2014 WL 496697 at *1.  According to the plaintiff, he repeatedly sought treatment from medical staff who prescribed him ineffective treatments primarily in the form of an antifungal cream over the course of several months during which time plaintiff's condition worsened into an "intense, severe, full-body itching."  Id. at *2-6.  The defendants in the case moved for summary judgment and characterized the case as a mere difference of opinion between an inmate and medical staff regarding the appropriate course of treatment.  The defendants argued that they provided plaintiff with medically appropriate treatment and did not disregard his symptoms but evaluated them and treated them on half a dozen or so occasions.  The defendants also presented undisputed expert testimony to the effect that because scabies symptoms often resemble symptoms caused by other conditions, doctors and nurses often fail to diagnose it early on and only make accurate diagnoses after a patient's rash and itching continue for some months.  Id. at *7-10.  In denying defendants' motion for summary judgment, the court emphasized that "a failure to competently treat a serious medical condition may constitute deliberate indifference in a particular case."  Id. at *8.  The court rejected defendants' argument that their failure to accurately diagnose the prisoner-plaintiff's scabies condition constituted a mere difference of opinion about the appropriate treatment.  See id. at *9.  Of particular concern to the court was the fact that the plaintiff had been applying antifungal cream for twenty-eight days and had received multiple refills of the cream, but continued to complain of "intense" and "severe itching."  Nevertheless, the defendant nurse directed him to continue the antifungal medication, which for the past month had not stopped the spread of the rash or relieved plaintiff's symptoms.  The defendant doctor in that similarly told the plaintiff to continue using the cream until several months had passed, and the defendant doctor acknowledged the possibility that plaintiff had been correct and prescribed him cream specifically for treatment of scabies, which promptly cured plaintiff's condition.  The court observed that the delay in providing plaintiff with effective medical treatment caused the plaintiff significant harm.  Indeed, plaintiff had submitted numerous medical requests and documented his suffering and discomfort.  See id. at *9.

1    Other courts have similarly held that evidence of a defendant's continued adherence to a

2    course of medical treatment that had proven ineffective was sufficient to raise a genuine issue of

3    material fact as to whether the defendant was deliberately indifferent to a serious medical need or

4    provided medically acceptable care.  See Masden v. Risenhoover, No. C 09-5457 SBA (pr), 2013

5    WL 1345189 at *17 (N.D. Cal. Mar. 29, 2013) (nurse's treatment could be construed as

6    deliberately indifferent because the nurse "continued to follow an ineffective course of pain

7    treatment for Plaintiff despite his repeated complaints that her actions were exacerbating his

8    condition and causing severe side effects."); Cash v. Swingle, No. 2:10-cv-1082 EFB P, 2012 WL

9    2521816 at *6 (E.D. Cal. June 28, 2012) (triable issue of material fact found as to whether course

10   of treatment defendants pursued was medically acceptable because plaintiff's evidence showed

11   methadone was necessary to control his pain, defendants knew as much, but defendants continued

12   to prescribe medication that was either wholly ineffective or ineffective unless combined with

13   methadone).

14    Just as the courts did in the cases discussed above, here, the court concludes that a

15   reasonable juror could conclude that defendants Martinez and Todd responded to plaintiff's

16   serious medical needs with deliberate indifference.  Farmer, 511 U.S. at 834; Estelle, 429 U.S. at

17   106; see also Wood, 900 F.2d at 1234 ("poor medical treatment will at a certain point rise to the

18   level of a constitutional violation").  Under plaintiff's version of events in this case, the

19   defendants repeatedly disregarded his complaints, delayed his medical treatment resulting in

20   significant harm, and/or failed to treat him competently over the course of several years.  Based

21   on the evidence submitted on summary judgment and drawing all reasonable inferences in

22   plaintiff's favor, this court cannot say as a matter of law that defendants were not deliberately

23   indifferent to plaintiff's serious medical needs.  See Farmer, 511 U.S. at 842 ("a factfinder may

24   conclude that a prison official knew of a substantial risk from the very fact that the risk was

25   obvious.").

26    The court acknowledges that a mere difference of opinion between plaintiff and

27   defendants or other prison medical staff does not give rise to a § 1983 claim.  Toguchi, 391 F.3d

28   at 1058; Jackson, 90 F.3d at 332; see also Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D.

1   Cal. 2006).  Likewise, "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not

2   support this cause of action."  Broughton, 622 F.2d at 460.  In this case, however, there are

3   disputed issues of material fact with respect to the medical care defendants provided to plaintiff

4   and the circumstances presented at the time that care was provided which preclude the granting of

5   summary judgment.  See McGuckin, 974 F.2d at 1062 ("A finding that the defendant repeatedly

6   failed to treat an inmate properly or that a single failure was egregious strongly suggests that the

7   defendant's actions were motivated by 'deliberate indifference' to the prisoner's medical

8   needs."); Wood, 900 F.2d at 1334 ("In determining deliberate indifference, we scrutinize the

9   particular facts and look for substantial indifference in the individual case, indicating more than

10  mere negligence or isolated occurrences of neglect.").

11      Accordingly, defendants' motion for summary judgment should be denied.

12                                     **OTHER MATTERS**

13      Defense counsel has submitted formal objections to plaintiff's evidence.  Insofar as

14  defendants' objections are relevant to the court's disposition of the pending motion for summary

15  judgment as set forth herein, they are overruled.  It would be an abuse of discretion to refuse to

16  consider evidence offered by a pro se plaintiff at the summary judgment stage.  See, e.g., Jones v.

17  Blanas, 393 F.3d 918, 935 (9th Cir.2004) (reversing and remanding with instructions to consider

18  evidence offered by the pro se plaintiff in his objections to the findings and recommendations).

19                                      **CONCLUSION**

20      Accordingly, IT IS HEREBY RECOMMENDED that:

21      1. Defendants' motion for summary judgment (Doc. No. 47) be denied; and

22      2. This action be referred back to the undersigned for further pretrial proceedings.

23      These findings and recommendations are submitted to the United States District Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

25  after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

27  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

28  objections shall be filed and served within seven days after service of the objections.  The parties

1   are advised that failure to file objections within the specified time may waive the right to appeal

2   the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   Dated:  July 8, 2014

4

5   _____

    DALE A. DROZD

6   UNITED STATES MAGISTRATE JUDGE

7   DAD:9
    barr1567.57

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28